IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| MELVIN TAYLOR, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| VS. | : | NO. 3:11-CV-87 (CDL) |
| | : | |
| CATHY THOMPSON, R.N., | : | |
| | : | Proceedings Under 42 U.S.C. § 1983 |
| Defendant. | : | Before the U.S. Magistrate Judge |
| _____ | : | |

## RECOMMENDATION

Before the Court is Defendant Cathy Thompson's Motion for Summary Judgment. Doc. 33. Because Plaintiff Melvin Taylor has failed to demonstrate a genuine issue of material fact, and because Defendant is entitled to judgment as a matter of law, it is hereby **RECOMMENDED** that Defendant's Motion for Summary Judgment be **GRANTED**.

FACTUAL AND PROCEDURAL HISTORY

On May 10, 2011, Plaintiff Melvin Taylor, proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983 alleging that Defendant Cathy Thompson, R.N., was deliberately indifferent to his serious medical needs in violation of his constitutional rights. Doc. 1. Plaintiff alleges that Defendant failed to provide adequate medical treatment and caused unreasonable delay in Plaintiff's medical care while Plaintiff was incarcerated at the Walton County Jail (WCJ).

Plaintiff's Complaint alleges that, prior to his arrest on March 31, 2010, Plaintiff had been diagnosed with a brain tumor and was scheduled for surgery. Doc. 1. Upon his incarceration at WCJ, Plaintiff informed Defendant of his brain condition and his need for surgery. Plaintiff states that, despite numerous complaints about headaches and requests for treatment, he received only "pain pills" for his headaches. Plaintiff also contends that he was

1

given two MRIs while at the Jail and that these tests confirmed the existence of a brain tumor. Plaintiff also claims that the MRIs revealed that he would die if his tumor was not treated. Plaintiff maintains that Defendant refused to acknowledge the existence of his brain tumor despite knowledge of the MRI results. On February 8, 2011, Defendant responded to Plaintiff's Inmate Request Form complaining about his medical treatment by stating that no surgery was scheduled and that the "MRI revealed no tumor or problem in brain". Def. Exhibit A at 118 (Doc. 33-2).

Plaintiff states that he was finally able to receive treatment for his brain tumor in August 2011, more than a year after he entered the WCJ. Doc. 15. Plaintiff was released on house arrest in August 2011 to receive a biopsy, and Plaintiff returned to the WCJ in November 2011. Doc. 24. Plaintiff alleges that the cost of treatment was a factor in the delay in medical treatment.

Plaintiff's medical records reveal that he was diagnosed with a brain tumor in 2006. Def.'s Exhibit A at 18, 23 (Doc. 33-2). Plaintiff was scheduled to have surgery at that time, but Plaintiff was incarcerated prior to his scheduled surgery date. Id. at 23. After Plaintiff was released from custody in 2006, he never returned to a doctor for treatment because he was afraid. Id. at 25.

Plaintiff's medical records also reveal that he received extensive medical treatment while at the WCJ, most of which was performed by non-defendant physicians and nurses. Upon Plaintiff's incarceration on March 31, 2010, Defendant, who is the Health Services Administrator at the WCJ, examined Plaintiff and determined that Plaintiff's vital signs were within normal limits. Id. at 25. Defendant also ordered the nursing staff to acquire a release from Plaintiff to obtain his outside medical records. Def. Aff. (Doc. 33-2).

Plaintiff began complaining of headaches on May 18, 2010. Def. Exhibit A at 75 (Doc. 33-2). The following day, Plaintiff was seen by Nurse Balkcom, who ordered blood pressure medication, blood pressure monitoring, and laboratory studies for Plaintiff. Id. at 25. Nurse Balkcom also ordered that Plaintiff be placed on the physician's chronic care list for his history of hypertension and scheduled him to be seen by an upper level medical provider. Id. On June 1, 2010, Plaintiff was seen by Nurse Pacitti and given further treatment for his headaches and hypertension. Id. at 26. Plaintiff's outside medical records received by the WCJ at that time had not yet confirmed Plaintiff's 2006 brain tumor diagnosis. Id. Plaintiff was treated by nurses throughout June and early July for his headaches and hypertension. Id. at 77-81.

Because Plaintiff continued to complain of headaches, Dr. Gaskin examined Plaintiff on July 16, 2010. Id. at 52; Gaskin Aff. (Doc. 33-3). By this time, the WCJ had received confirmation of Plaintiff's 2006 diagnosis and subsequent failure to follow up with his treatment. Id. Dr. Gaskin documented that Plaintiff had a history of being diagnosed with a low-grade, non-enhancing glioma (brain tumor) in 2006, but that he never sought any treatment following the diagnosis. Id. Dr. Gaskin also found that Plaintiff's physical exam was within normal limits and that Plaintiff did not have any neurologic deficits. Id. Dr. Gaskin determined that Plaintiff was asymptomatic and therefore did not require further evaluation or treatment. Id.

Because Plaintiff's headaches continued, Dr. Gaskin ordered an MRI of Plaintiff's brain on August 27, 2010. Def. Exhibit A at 42 (Doc. 33-2); Gaskin Aff. (Doc. 33-3). Plaintiff's off-site MRI was scheduled for September 15, 2010, and Plaintiff's pain medication was increased. Id. On September 15, 2010, Plaintiff was sent to Walton Regional Hospital for his scheduled MRI. Def. Exhibit A at 55 (Doc. 33-2).

Plaintiff continued to be seen by Dr. Gaskin and nurses at the WCJ in September and October regarding his headaches. Plaintiff's medications were increased, and Plaintiff was prescribed Percogesic and Topamax. Id. at 43. On October 22, 2010, Dr. Gaskin referred Plaintiff to an off-site neurologist, Dr. Syed. Id. at 44. On November 17, 2010, Dr. Syed reviewed Plaintiff's MRI and determined that there was a small area in Plaintiff's brain that was possibly a tumor. Id. at 57. Dr. Syed recommended that Plaintiff receive another MRI for further evaluation as well as a potential neurosurgery consult to determine if a biopsy would be necessary. Id.

A second MRI was scheduled for Plaintiff on January 17, 2011, and Plaintiff was again transported to Walton Regional Hospital for testing. Id. at 45, 56. On February 16, 2011, Dr. Wexler reported that Plaintiff's most recent MRI did not verify the presence of a tumor. Id. at 31. Dr. Wexler, however, provided Plaintiff with additional medications for his headaches. Id. Because Plaintiff continued to complain of headaches, Dr. Wexler increased Plaintiff's medications throughout March, April, and May 2011. Id. at 133-135.

On May 20, 2011, Defendant received a phone call from Dr. Gunnier at East Central Regional Medical Center informing her that Emory University Hospital (Emory) indicated that Plaintiff needed a biopsy due to changes in white matter in his brain. Id. at 33. Defendant responded by having Plaintiff sign another authorization form to obtain the records from Emory for review by the WCJ physician. Id.

On May 28, 2011, Plaintiff's head was struck against a wall several times during an altercation in the housing unit. Id. Plaintiff was sent to the Walton Regional Hospital emergency room. Id. Plaintiff returned the same day without additional orders from the emergency room physicians. Id. at 34. On May 31, 2011, Plaintiff received follow-up treatment from Dr. Wexler

4

for his headaches and injuries suffered in the altercation. Id. Dr. Wexler prescribed Plaintiff pain medication and a muscle relaxer. Id.

On June 14, 2011, Dr. Wexler ordered that Plaintiff be scheduled to see a neurologist at Emory. Following communications with Emory in June, the WCJ medical staff was able to secure a biopsy appointment for Plaintiff at the Emory for August 15, 2011. Dr. Wexler prescribed additional medication for Plaintiff prior to his release for surgery. Id. at 50.

Plaintiff's medical records show that Plaintiff was admitted to Emory on August 15, 2011 for his brain biopsy. Id. at 139. On September 13, 2011, Plaintiff returned to Emory for a follow-up appointment. Id. at 142. Plaintiff's biopsy revealed that the pathology was questionable for a low-grade brain tumor. Id. Dr. Hadjipanayis reported that although Plaintiff still complained of headaches, Plaintiff was doing well overall. Id. After discussing Plaintiff's condition, the physicians at Emory determined that Plaintiff did not require further treatment. Id. The physicians requested that Plaintiff return in three months for another MRI. Id. Plaintiff returned to Emory on December 20, 2011 for his follow-up MRI. Id. at 144. The physicians again determined that Plaintiff's brain tumor was of a very low-grade and stable. Id. at 144-45. Accordingly, the physicians determined that no further treatment was necessary at the time. Id. at 145.

## LEGAL STANDARD

In accordance with Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact arises only when "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Cleotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). If the moving party meets this burden, the burden shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the moving party is not entitled to judgment as a matter of law." Id. at 324-26. If the evidence presented by the non-movant is "not significantly probative" or is "merely colorable," then summary judgment must be granted. Anderson, 477 U.S. at 249. In fact, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## DISCUSSION

Plaintiff alleges that Defendant was deliberately indifferent to his serious medical needs by failing to provide adequate medical treatment and causing unreasonable delay in Plaintiff's medical care while Plaintiff was incarcerated at the WCJ. Plaintiff has failed to show that there are genuine issues of material fact regarding his medical treatment at the WCJ. Because Plaintiff received substantial medical treatment while at the WCJ, and because Plaintiff has failed to show that his condition was worsened by any delay in receiving a biopsy, Defendant is entitled to judgment as a matter of law.

To create genuine issues of material fact, Plaintiff must point to evidence that Defendant was deliberately indifferent to Plaintiff's serious medical needs. Because Plaintiff was a pretrial detainee at the WCJ, his claims must be examined under the Due Process Clause of the Fourteenth Amendment. Snow ex rel. Snow v. City of Citronelle, Ala., 420 F.3d 1262, 1268 (11th Cir. 2005). The standards to establish a deliberate indifference claim under the Fourteenth Amendment, however, are identical to the standards under the Eight Amendment. Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115 (11th Cir. 2005).

To establish deliberate indifference, the prisoner must satisfy both an objective and a subjective component. Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999). With regard to the objective component, a prisoner must allege both an objectively serious medical need that, if left unattended, poses a substantial risk of serious harm, and also that the response by the prison official to that need was poor enough to constitute an unnecessary and wanton infliction of pain. Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000). With respect to the subjective component, a prisoner must allege, and ultimately prove, three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and, (3) by conduct that is more than mere negligence. McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999). Additionally, as with any tort claim, the prisoner must show that an injury was caused by the defendant's wrongful conduct. See Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir. 1995).

It is not enough, then, to show that the care provided was less than optimal, or that a different course of treatment might have been preferable. The elements required to prove the subjective component of a deliberate indifference claim establish that "mere accidental inadequacy, negligence in diagnosis or treatment, [and] even medical malpractice" are not actionable under 42 U.S.C. § 1983. Taylor, 221 F.3d at 1258. A prisoner cannot establish a

violation simply because he "may have desired different modes of treatment" than that which was provided to him. Hamm v. DeKalb County, 774 F.2d 1567, 1576 (11th Cir. 1985). Such course of treatment claims, by definition, involve the "exercise of professional judgment" and as such are not actionable. Estelle, 429 U.S. at 105. Additionally, a nurse is not deliberately indifferent when she reasonably follows a doctor's orders. Bauer v. Kramer, 424 Fed. Appx. 917, 919 (11th Cir. 2011).

In this case, Plaintiff's medical records show that he was provided with substantial medical care by the medical staff at the WCJ. Although Plaintiff was treated on numerous occasions by various members of the WCJ medical staff, Plaintiff was only examined by Defendant on March 31, 2010. On that occasion, Defendant provided Plaintiff with pain medication for his headaches and placed Plaintiff on the Tension Headache Nursing Protocol. Def. Exhibit A at 25 (Doc. 33-2). Because Plaintiff informed Defendant that he had been previously diagnosed with a brain tumor, Defendant initiated the process of obtaining Plaintiff's outside medical records.

Although it took three months to verify Plaintiff's brain tumor diagnosis, Plaintiff was systematically treated for his headaches in the interim. Plaintiff received pain medication, which was increased over time as Plaintiff continued to complain of headaches. After Plaintiff's outside medical records were obtained, they were reviewed by Dr. Gaskin on July 16, 2010. Dr. Gaskin reported that despite Plaintiff's diagnosis of a low-grade, non-enhancing brain tumor four years prior to his incarceration, Plaintiff's physical exam was within normal limits and no further treatment was necessary. Because Plaintiff's headaches continued, Dr. Gaskins ordered an MRI for Plaintiff in September 2010 and increased Plaintiff's medications in the following months. Plaintiff was referred to a neurologist in November 2010, and the WCJ medical staff ordered a

second MRI in January 2011. Dr. Wexler reviewed Plaintiff's second MRI in February 2011 and determined that the MRI did not verify the presence of a brain tumor.

Defendant then received a phone call from Emory on May 20, 2011 indicating that Plaintiff did in fact need a biopsy. Defendant then took steps to ensure that Plaintiff was seen again by Dr. Wexler, who scheduled Plaintiff to be seen by a neurologist at Emory. On June 24, 2011, Plaintiff's biopsy appointment was scheduled for August 15, 2011.

Defendant was also responsible for responding to Plaintiff's complaints about his medical treatment at the WCJ. Plaintiff's allegations against Defendant appear to stem from Defendant's response on February 8, 2011, which stated that Plaintiff was not scheduled for surgery because Plaintiff's MRI revealed no tumor or problem in his brain. Plaintiff believed that he was scheduled for surgery at the time. In fact, there was no surgery scheduled for Plaintiff. Although neurologist Dr. Syed reported that Plaintiff's August 2010 MRI was questionable for a tumor and recommended a second MRI, no physician at the WCJ had scheduled surgery at that time. Defendant's response was supported by Dr. Wexler's findings less than a week later, which stated that Plaintiff's January 2011 MRI did not verify the existence of a tumor. Despite Defendant's response, Plaintiff still received continuous care for his condition. Even though it was ultimately determined by physicians at Emory that Plaintiff needed a biopsy, Defendant's response to Plaintiff's request does not amount to deliberate indifference. Because a difference in medical judgment does not support a claim of deliberate indifference, any claim based on different interpretations of Plaintiff's MRIs among Dr. Gaskin, Dr. Wexler, Dr. Syed, and the physicians at Emory is without merit. See Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995).

Plaintiff also alleges that Defendant was deliberately indifferent by causing undue delay in his ability to have a biopsy performed. To establish a claim of deliberate indifference based on

delay in medical care, a prisoner must establish that he suffered increased injury due to the delay. See Goebert v. Lee County, 510 F.3d 1312, 1327 (11th Cir. 2007). In determining whether delay in treatment amounts to deliberate indifference, courts should consider: (1) the seriousness of the medical need, (2) whether the delay worsened the medical condition, and (3) the reason for the delay. Id.

In this case, Plaintiff has failed to show that the delay in treatment resulted in an increased injury to his brain tumor. Plaintiff has been living with a low-grade, non-enhancing brain tumor since 2006. Prior to his incarceration at WCJ, Plaintiff refused to seek treatment for his brain tumor after he received his diagnosis. Plaintiff continually complained of headaches, but multiple MRIs did not conclusively establish the existence of Plaintiff's brain tumor. Although Plaintiff was sent to the emergency room following an altercation, no tests throughout Plaintiff's incarceration revealed that Plaintiff required emergency treatment. Most importantly, Plaintiff's biopsy ultimately showed what the WCJ's physicians suspected all along: that Plaintiff's condition was non-enhancing and therefore more aggressive treatment was not necessary.

Although Plaintiff contends that the delay in treatment was based on financial considerations, this conclusory allegation is not supported by the evidence. Plaintiff was treated on a systematic basis and received multiple MRIs prior to his biopsy. Plaintiff did in fact have to wait over a year to get a biopsy, but a majority of this time was spent attempting to verify Plaintiff's diagnosis, providing Plaintiff with additional testing, and scheduling different off-site appointments for Plaintiff. It is not the case that Plaintiff's complaints were simply ignored. Accordingly, Plaintiff has failed to establish that Defendant was deliberately indifferent to his serious medical needs.

## CONCLUSION

Because the evidence in the record of this case is insufficient to permit a finding that Defendant was deliberately indifferent to Plaintiff's serious medical needs, it is hereby **RECOMMENDED** that Defendant's Motion for Summary Judgment be **GRANTED**. Pursuant to 28 U.S.C. § 636 (b)(1), the parties may serve and file written objections to this **RECOMMENDATION** with the district judge to whom the case is assigned **WITHIN FOURTEEN (14) DAYS** after being served with a copy thereof.

**SO RECOMMENDED**, this 24th day of July, 2012.

s/ Charles H. Weigle_____
Charles H. Weigle
United States Magistrate Judge